IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

KASIE STAMBAUGH,                    )
                                    )
              Plaintiff,            )
                                    )
vs.                                 )        No. CIV-16-1452-W
                                    )
STATE OF OKLAHOMA ex rel.           )
OKLAHOMA WATER RESOURCES            )
BOARD,                              )
                                    )
              Defendant.            )

## ORDER

This matter comes before the Court on the Motion for Summary Judgment filed by defendant State of Oklahoma ex rel. Oklahoma Water Resources Board ("OWRB") pursuant to Rule 56, F.R.Civ.P. Plaintiff Kasie Stambaugh has responded in opposition, and OWRB has filed a reply in support of its argument that summary judgment in its favor is warranted because Stambaugh "was terminated for [no] . . . reason other than . . . job performance issues." Doc. 35 at 1.

Summary judgment should be granted, as OWRB has requested, if it has "show[n] that there is no genuine dispute as to any material fact[1] and [that it] . . . is entitled to judgment as a matter of law." Rule 56(a), supra. OWRB therefore "'has the initial burden to show "that there is an absence of evidence to support . . . [Stambaugh's] case."'" BancOklahoma Mortgage Corp. v. Capital Title Co., 194 F.3d 1089, 1097 (10th Cir. 1999)

---

[1]"A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" Bird v. West Valley City, 832 F.3d 1188, 1199 (10th Cir. 2016) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)); "a fact is material when it 'might affect the outcome of the suit under the governing [substantive] law.'" Id. (quoting Liberty Lobby, 477 U.S. at 248).

(quotations omitted); e.g., Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137 (10th Cir. 2016)(movant may satisfy initial burden by pointing out lack of evidence on essential element of nonmovant's claim).  If OWRB does so, "'the burden then shifts to . . . [Stambaugh], who must offer evidence of specific facts that is sufficient to raise "a genuine issue of material fact."'"  Id. (quotations omitted).

At this stage of the litigation, the Court does not evaluate the credibility of the witnesses, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), or "weigh the evidence and determine the truth of the matter . . . ."  Id. at 249.  Rather, the Court must

> determine whether there is a genuine issue for trial. . . . [T]here is no [triable] issue . . . unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Id. at 249-50 (citations omitted).  The Court "must view the evidence presented through the prism of the substantive evidentiary burden[,]" id. at 254, and decide "whether th[at] evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

"In making this determination, . . . [the Court] 'examine[s] the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party.'"  Pinkerton v. Colorado Department of Transportation, 563 F.3d 1052, 1058 (10th Cir. 2009)(quotation omitted).  Thus, the Court must accept Stambaugh's account of the events giving rise to this lawsuit to the extent that account is supported by the record and not based on conclusory allegations, speculation or suspicion about OWRB's adverse employment decision and the reasons therefor.  E.g., Bird v. West Valley City, 832 F.3d 1188, 1199 (10th Cir. 2016)(nonmoving party cannot rest on ignorance of facts, speculation or suspicion); Self v. Crum, 439 F.3d 1227, 1230 (10th Cir.

2006)(to defeat summary judgment motion, evidence, including testimony, must be based on more than mere speculation, conjecture or surmise; unsubstantiated allegations carry no probative weight in summary judgment proceedings); <u>McKibben v. Chubb</u>, 840 F.2d 1525, 1528 (10th Cir. 1988)(while facts must be construed liberally in favor of nonmovant, unsupported conclusory allegations not sufficient to establish disputed issues of fact).

Stambaugh was hired by OWRB on May 13, 2014, as an Environmental Programs Specialist II. <u>See</u> Doc. 28-6. Her supervisor was Matthew Rollins,[2] an Environmental Specialist IV, in the Floodplains Management Division. Rollins' supervisor was Gavin Brady, OWRB Administration Programs Officer.

Hirees are subject to a twelve (12)-month probationary period. Title 74, section 840-4.13(D) of the Oklahoma Statutes provides that "[e]very person . . . shall be appointed for a probationary period of one (1) year," 74 O.S. § 840-4.13(D), unless that period is waived "after a probationary employee has served six (6) months[.]" <u>Id</u>.;[3] <u>e.g.</u>, Rule 530:10-11-30, Merit System of Personnel Administration Rules ("MSPA Rules"); OWRB Human Resources Handbook ("OWRB Handbook") Section 4.3 at 2. During the probationary period, the "employee is required to demonstrate fitness for the job . . . by

---

[2]Stambaugh has argued that OWRB "is strictly liable for Rollins' [conduct] . . . ." Doc. 34 at 34. OWRB has not argued to the contrary. <u>E.g.</u>, <u>McInnis v. Fairfield Communities, Inc.</u>, 458 F.3d 1129, 1136 (10th Cir. 2006)(employer vicariously liable for compensatory damages when supervisor with immediate (or successively higher) authority over employee perpetrates Title VII violation).

[3]According to Stambaugh, Rollins told her when she was offered the position in March 2014, "'You will be off probation in six months[,]'" Deposition of Kasie Stambaugh (February 15, 2018) at p. 28, line 4 (hereinafter "Stambaugh Deposition"), and then in November 2014, he said to her, "'Well, you are off probation now.'" <u>Id</u>. line 15. Stambaugh has disputed that she was a probationary employee at the time she was terminated even though she never received a paper indicating that her probationary period had been waived, <u>e.g.</u>, 74 O.S. § 840-4.13(D)(employee and Director of the Office of Management and Enterprise Services shall be notified in writing as to waiver and reason therefor), verified her employment status or discussed the matter with anyone. <u>See</u> Stambaugh Deposition at p. 30, lines 14-18; <u>id</u>. at p. 31, lines 10-13.

the satisfactory performance of the [job's] duties and responsibilities[,]" Rule 260:25-1-2, MSPA Rules, and "can be terminated at any time at will." OWRB Handbook Section 4.3 at 2; e.g., Rule 260:25-11-32, MSPA Rules.

In a series of memoranda that were placed only in Stambaugh's personnel file,[4] Rollins documented issues regarding Stambaugh's work hours and job performance. In the first one, dated November 3, 2014, Rollins recounted a meeting in Tahlequah, Oklahoma, that he, Brady and Stambaugh attended. They met with the Cherokee County Floodplain Board regarding a community assistance visit that had been conducted in March 2014. Rollins wrote that Stambaugh had incorrectly advised board members "that a [f]lood study would be needed[,]" Doc. 28-14, and continued to insist on the necessity of such a study, even after he and Brady "both explained that the regulations do not require . . . [a] study." Id.

On December 3, 2014,[5] Rollins drafted a memorandum that contained information about a meeting on November 25, 2014, that he attended in Piedmont, Oklahoma. Also present were Stambaugh, Roberto Ramirez, an employee of Federal Emergency Management Agency ("FEMA"), and Wade Harden, Piedmont's City Planner. See Doc.

---

[4]Stambaugh has contended that while Rollins "secretly document[ed] problems with [her] . . . behavior and performance and discusse[d] the[ ] [problems] with other [OWRB] . . . employees[,]" Doc. 34 at 7, he "never [told her] . . . that he ha[d] any problems with her performance." Id. But see OWRB Handbook, Section 6.1.4.A (documentation of informal discipline will be noted and maintained by supervisor, but such records generally not available to the employee unless formal disciplinary action is taken); Affidavit of Matthew Rollins (May 2, 2018) at p. 1, ¶ 6 ("after repeated instances of tardiness, and no sign of improvement after discussing it with her")(hereinafter "Rollins Affidavit"); Deposition of Gavin Brady (March 14, 2018) at p. 40, line 25 (in a meeting attended by Brady, Stambaugh and Rollins, Stambaugh's "tardiness was brought up")(hereinafter "Brady Deposition").

[5]The Court has assumed the date of the memorandum—"11/03/14"—is a clerical error since Rollins addresses in that document a meeting that occurred on November 25, 2014. See Doc. 28-12.

4

28-12.  Rollins related therein a disagreement about municipal boundaries between Stambaugh and Ramirez and Harden.  See id.

On January 14, 2015, Rollins reported that Stambaugh had been "observed walking into . . . [a] [w]orkshop at 8:50 [a.m. and that] . . . [c]lassroom start time was 8:30 am[.]"  Doc. 28-15.[6]  When asked twice "why she was late[,]" id., Stambaugh "had no response," id., to the first inquiry and "avoided the [second] question[.]"  Id.[7]

A memorandum dated April 3, 2015, related Stambaugh's failure to provide complete documentation in connection with a community assistance visit in Skiatook, Oklahoma, on March 23, 2015, and noted Rollins' skepticism of the reasons given by Stambaugh in response to his request for "an explanation on why the documentation was incomplete."  Doc. 28-13; e.g., Doc. 28-2 at 3).

On April 6, 2015, Rollins wrote about a meeting with Stambaugh that same date "to review her work assignments, work report time, and activities for the upcoming week. . . ."  Doc. 28-8.  Rollins stated:

> [The] [s]econd topic covered was time reporting and work attendance. . . . I asked her about her start time for each day. She stated that 8:30 am was her start time. I explained to her if she need[ed] to adjust her start time to better manage her morning, she would need to send me a[n] email by the end of the day to adjust the start time. No email has been received . . . . Thus her daily start time for office work shall remain 8:30 am.

Id.[8]

---

[6]During her deposition, Stambaugh conceded that she "may have," Stambaugh Deposition at p. 173, line 11, arrived at 8:50 a.m., but "believe[d]," id. ¶ 14, that the start time of "the workshop [had] changed to 9:00 . . . ." Id. at p. 172, line 25 to p. 173, line 1.

[7]Stambaugh has disputed that Rollins interrogated her about her arrival time. See id. at p. 173, line 25 to p. 174, line 4.

[8]Stambaugh has denied knowledge of her start time. See id. at p. 119, lines 7-15 ("Q. What was your start time? A. I don't know. Q. You don't have any idea what time you are

In a memorandum dated April 20, 2015, Rollins stated that he had requested that Stambaugh send him that day "the Permitting Presentation that she delivered at the Floodplain Management 101 course on April 16, 2015 . . . by 9:30 am. " Doc. 28-11. Rollins wrote that "[a]s of 1:45 p.m. . . . . no [P]ermitting [P]resentation ha[d] been received[,]" id., even though "a read receipt . . . indicate[d] that [his] . . . email [had been] . . . read." Id.

Finally, in a memorandum dated April 23, 2015, a copy of which was given to J.D. Strong, OWRB Executive Director, and Julie Cunningham, OWRB Planning and Management Division Chief, Rollins addressed Stambaugh's "[w]ork performance[,]" Doc. 28-2; he commented on her tardiness and problems with her work assignments.[9]

In the section of the memorandum titled "Work Attendance," Rollins repeated the circumstances regarding Stambaugh's tardy arrival at the workshop on January 14, 2015. See id.; Doc. 28-15. He also wrote that Stambaugh had been informed on January 30, 2015, during "her Mid Year review," id. at 1, that her "designated start time . . . [was] 8:30 am[,]" Doc. 28-2 at 1,[10] and that she had been advised that "[s]everal instances of

---

supposed to be at work?  A. Once I moved, I was coming to work at 9:00.  Q. Did you ask anybody if you could start doing that?  A. I . . . don't know."); id. at p. 120, lines 18-22 ("Q. What time were you supposed to be in the office?  A. I don't know remember.  Q. Do you believe you had a start time?  A. I don't know.").

[9]Stambaugh not only has denied that the statements in this memorandum are true, but also has denied "that Rollins actually acted based on these concerns." Doc. 34 at 8, ¶ 8. She has argued that Rollins instead "acted because (1) he was chagrinned by [her] . . . rejecti[on] [of] his sexual advances or (2) he feared that [she] . . . might report him." Id. at 9, ¶ 8.

[10]Stambaugh testified in her deposition that she had a copy of the matters discussed during her review on January 30, 2015, and that Rollins "never talked to . . . [her] about [her insubordinate conduct] . . . [,]" Stambaugh Deposition at p. 174, lines 20-21, or her tardiness. E.g., id. lines 22-24.  That paper is not part of the record.

tardiness had been observed . . . and . . . needed to make an effort to be . . . on time." Id.

Rollins also explained in his memorandum that on March 18, 2015, a meeting was held for Floodplain Management Division staff. He, Kent Wilkins, Assistant Division Chief, Brady, Stambaugh and Cathy Poage, an administrative assistant working in Woodward, Oklahoma, whom Rollins also supervised, attended.  Rollins reported that the meeting agenda included review of "[w]ork schedules and report times[,]" id. at 2, and that the staff was "remind[ed] . . . [to] be on time[.]"  Id.  Finally, Rollins documented nine (9) additional times after January 14, 2014, that "Stambaugh ha[d] reported to the OWRB main office past the 8:30 am report time."  Id.[11]

In the section of the memorandum titled "Work Assignments," Rollins advised of an incident on March 20, 2015, regarding Stambaugh's insistence that she conduct a community assistance visit that had already been conducted and her failure to have an employee of the United States Army Corps of Engineers "cleared . . . as a ride along[,]" id., to the visit.   Rollins also repeated Stambaugh's failure to provide complete documentation on April 14, 2015, in connection with the community assistance visit in Skiatook on March 23, 2015, and her failure to provide a reason for the incomplete documentation, see Doc. 28-13, as well as her failure on April 20, 2015, to provide a copy of the Permitting Presentation that she delivered on April 16, 2015, at the Floodplain Management 101 course.  See Doc. 28-11.

Rollins also commented on Stambaugh's failure in March 2015 to complete an assignment regarding the 2015-2016 Floodplain Management 101 course and advanced

---

[11]Rollins identified those dates in his memorandum as March 9, 20, 23 and 25, and April 2, 3, 15, 20 and 21, 2015.  See Doc. 28-2 at 2.

courses and her response to an inquiry about the status of the assignment.  He wrote that

Stambaugh "stated . . . she had been too busy preparing [another] . . . presentation[,]" id.

at 4, and had "had numerous phone calls requiring customer assistance[,]" id., even

though only two entries for customer assistance calls had been listed during that time.

Finally, in his memorandum dated April 23, 2015, Rollins again referred to the

Floodplain Management Workshop on April 16, 2015.  Stambaugh had been directed by

Rollins and Brady to present and discuss topics found in Chapter 4 of the Oklahoma

Floodplain Management 101 Handbook.  Rollins wrote that Stambaugh not only failed to

have her presentation ready for review prior to the workshop (as instructed by Brady), but

also imparted incorrect information and discussed material beyond the scope of Chapter

4.

This memorandum prompted a discussion among Strong, Rollins, Brady, Wilkins

and Cunningham, see Deposition of Julie Cunningham (March 9, 2018) at p. 50, lines 6-

12 (hereinafter "Cunningham Deposition"); Deposition of Gavin Brady (March 14, 2018)

at p. 15, lines 22-25 (hereinafter "Brady Deposition"), after which Strong and

Cunningham, based on Rollins' recommendation, made the decision to fire Stambaugh.

See Cunningham Deposition at p. 50, lines 23-25; id. at p. 51, lines 14-15; id. at p. 53,

lines 22-24; Brady Deposition at p. 55, lines 24-25.  It was determined "that [Stambaugh]

was not a good fit for the agency[,]" Cunningham Deposition at p. 51, lines 2-3, because

"[s]he was not performing the way that . . . she needed to perform."  Id. lines 5-6.

The next day, April 24, 2015, Brian Jepsen, OWRB Human Resources Manager,

and Cunningham notified Stambaugh that her employment was terminated.  The stated

reason as expressed in the Letter of Termination signed by Jepsen was "for the good of the service[.]"  Doc. 28-9.

It was during this meeting with Jepsen and Cunningham that Stambaugh for the first time reported to an OWRB supervisor that Rollins had sexually harassed her.[12]  In response, OWRB immediately hired Brian Kirtley, a senior Equal Employment Opportunity investigator, to verify Stambaugh's accusations that Rollins "'ha[d] done bad things,'" Doc. 28-3 at 1, and had "'touched [her] . . . leg.'"  Id.[13]

In his report dated June 5, 2015, Kirtley noted that Stambaugh had also told Jepsen and Cunningham:

(1) "I didn't mention . . . [Rollins' behavior] because he has a family and I did not want to get him in trouble[,]" id. at 2, ¶ 2(c);

─────────────────────

[12]Stambaugh testified during her deposition that in March 2015 she had had a conversation with Julie Chambers, OWRB Environmental Programs Manager, for whom Stambaugh had been an intern in February 2014.  During that conversation, Stambaugh said she "was crying[,]" Stambaugh Deposition at p. 137, line 6, and "telling [Chambers] . . . just how horrible [Rollins] . . . was being . . . , not communicating[.]"  Id. lines 6-8.  Stambaugh further testified:  "I think I said, 'I will never feel comfortable being alone in the car with him again." Id. lines 8-10.

The record also shows that Stambaugh contacted her parents and her cousin, Chad Briscoe, when she was traveling with Rollins to Elk City in March 2015.  Stambaugh said that she "told [Briscoe] . . . that Rollins [had] touched her leg[,]" Doc. 28-3 at 2-3, ¶ 3, and that she "was upset[.]"  Id. at 3, ¶ 3.

[13]During her deposition, Stambaugh was asked the following questions, and she gave the following answers:

Q. Where did he touch you on your leg?

A. He touched me right above my knee.

Q. And then where did he move his finger?

A. All the way up towards my leg, approximately two inches away from my vagina.

Stambaugh Deposition at p. 192, lines 17-22.

(2) "It's going to be bad for him[,]" id. ¶ 2(d); and

(3) "He won't talk to me or answer my e-mails." Id. ¶ 2(e).

Kirtley wrote that Stambaugh "[m]ore specifically," id. at 2, ¶ 2, "said that during a business trip the week of March 9, 2015 Rollins ran his finger up her leg[,]" id. (footnote omitted), while he was driving; she said that he "touched her leg three times on Monday[, March 9,] and three times on Tuesday[, March 10]." Id. Kirtley reported that Stambaugh also "said the final time Rollins touched her that he applied so much pressure that she could not lift her iPad[,]" id., off her leg and that after he "ran his fingers toward her vagina, . . . she gave him the worst look she could and he gave her a bad look back." Id. They continued to travel together on Wednesday to and from Elk City, Oklahoma, and on Thursday to Clinton, Oklahoma. Stambaugh made no further accusations about Rollins' behavior on those two days except that he "was horrible to her after [the events occurring on Monday and Tuesday] . . . and that she "did not want to be around [him] . . . anymore." Id.

Kirtley noted that Stambaugh "alleged that in the summer of 2014 Rollins [had] leaned over her several times when she was seated at her computer[,]" id., and that his "negative treatment . . . began when she . . . decline[d] his requests to go to dinner[,]" id., when they traveled.

In addition to Rollins, Stambaugh, Brady, Jepsen and Cunningham, Kirtley interviewed Chad Briscoe, Brian Maggott, Poage, Monty Porter, Linda Clay, Julie Chambers, Wilkins and Teri Sparks; he summarized Rollins and Stambaugh's interviews in his report.

In connection with Rollins' comments, Kirtley wrote:

(1) "Rollins denied ever touching Stambaugh[,]" Id. at 3, ¶ 6;

(2) "that they normally use iPads and that it was common for him to touch someone else's iPad that they would be holding[,]" id.;

(3) that "he has been on numerous trips with other females and there has never been an issue before[,]" id., and

(4) that "he always asks who he's traveling with if they want to get something to eat." Id. at 4, ¶ 6.

Rollins further stated "that he had talked to . . . Brady and . . . Wilkins about employment issues with Stambaugh that included chronic tardiness and her questioning long time [OWRB] procedures regarding travel." Id. See Doc. 28-14.[14] He admitted that "communication between them began breaking down in November 2014." Doc. 28-3 at 4, ¶ 6.

Kirtley wrote in his report that Stambaugh had "told Jepsen and Cunningham that she had a spreadsheet with dates and times[,]" id. at 2; he quoted one entry:

> 03-09-2015 to 03-12-2015  Touching my leg (repeat[ed]ly) with pressure (where I could hardly lift the map off my lap, so his finger would not be touching my leg) over and over; I kept lifting the map off my lap (to prevent contact) and gave him a "look" and he never got the hint; he did this on Monday and Tuesday, I drove on Wednesday. . . . [D]id not say a word to me all way to Kingfisher County or back to Elk City; I tried to make some con[v]er[s]ation.

Id. at 3, ¶ 3.

---

[14]In his memorandum dated November 3, 2014, Rollins noted that Stambaugh had complained that "travel[ing] to . . . meeting[s] . . . [was] inefficient," Doc. 28-14, and that the meetings should be done "over the phone, or via email." Id. Rollins wrote that "Brady explained [to her] that the reasons [OWRB personnel] . . . meet with the community is to assist in reviewing the documentation, review the program procedures and discuss any potential issues." Id.

In reporting other interviewees' statements, Kirtley wrote:

(1) Briscoe is Stambaugh's cousin; he said

(a) that Stambaugh "called him when she was in Elk City in March and told h[im] that Rollins touched her leg[,]" id. at 2-3, ¶ 3;[15] and

(b) that "Stambaugh was upset and that he interpreted her comments that Rollins had sexually harassed her." Id. at 3, ¶ 3.

(2) Maggot, Stambaugh's boyfriend, is employed by the Oklahoma Department of Environmental Quality as an environmental/chemical laboratory scientist. When interviewed, he stated

(a) that "Stambaugh told him that Rollins kept touching the map with so much force that she could not move and that he kept touching the map when she asked him not to[,]" id.;

(b) that Stambaugh also "told him that Rollins ran his fingers down her leg towards her vagina several times when they were facing south[,]" id. and

(c) "that Stambaugh was anxious and nervous about going to work and that work issues became progressively worse for her over the 11 months." Id.

(3) Poage indicated that since she worked in Woodward, she had only observed Stambaugh and Rollins at the conference in Clinton, and saw

(a) "that Stambaugh was very upset but did not know why[,]" id. ¶ 4, and

(b) "that Rollins was in a bad mood and was short and snippy." Id.

---

[15]See n.12, supra.

(4) Porter is an OWRB Environmental Programs Manager, who had previously supervised Rollins. He and Stambaugh had attended a conference in April 2015, during which Stambaugh "told him that Rollins would not communicate with her[,]" id. ¶ 5, but "did not mention anything about sexual harassment or Rollins touching her leg." Id.

(5) Clay is an OWRB Environment Specialist who has worked with Rollins since 2007. When interviewed, she said

(a) that she had "been on [over 100] . . . overnight trips with Rollins[,]"[16] id. at 4, ¶ 7; and

(b) that he always inquired about his fellow employees' dinner plans.

(6) Stambaugh had been an intern for Chambers in February 2014; Chambers advised that Stambaugh had confided "that Rollins would not talk to her and that she did not want to ride with him or be alone with him[,]" id. ¶ 8; Chambers also questioned "why Stambaugh would not have mentioned the issue to a manager." Id.

(7) Brady remarked during his interview that "[a]lthough there ha[d] been no allegations such as Stambaugh's, there ha[d] been communication issues with Rollins." Id. ¶ 11.[17] Brady advised that he had "talked to Rollins about Stambaugh feeling neglected and that he (Rollins) needed to work with her and talk to her more." Id.[18]

---

[16]See Rollins Deposition at p. 73, lines19-23 ("Q. So . . . Stambaugh would have been the first employee that was a female that would have gone on the [community assistance] visits that would require the overnight stays? A. That directly worked in the floodplain insurance section, correct. Yes.").

[17]See Brady Deposition at p. 29, lines 19-22; id. p. 31, lines 4-10.

[18]Brady testified during his deposition that Stambaugh had advised him that Rollins "wasn't communicating with her[,]" Brady Deposition at p. 30, lines 3-4, and that "'[h]e didn't talk to . . . [her].'" Id. at p. 31, line 7. Brady further testified that Stambaugh said "she did not want to go to dinner with him and that he seemed upset," id. lines 5-6, but he denied that Stambaugh had ever

Kirtley concluded in his report

(1) that "[t]here is some evidence to suggest that Rollins touched [Stambaugh's] . . . . leg inappropriately[,]" id. at 7;

(2) that she had "logged the event in a spreadsheet along with other issues she had with Rollins throughout her employment[,]" id., but that "[h]er log in the spreadsheet . . . [was] not entirely consistent with her verbal statements." Id.

Kirtley further concluded that "[c]learly, this supervisor[ ]/employee relationship was not working[,]" id. at 8, and although "Rollins and Stambaugh did not have a good working relationship before the Elk City trip and afterwards[,]" id., that "[t]he preponderance of the evidence did not indicate that anything that occurred or may have occurred during the Elk City trip contributed to her termination." Id. at 8.

Stambaugh brought suit on December 21, 2016,[19] seeking relief under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[,]" id. § 2000e-2(a)(1), and Stambaugh

---

stated that she "'didn't feel comfortable going to dinner[,]'" id. line 18, or that she felt uncomfortable being alone with Rollins.  See id. lines 20-22.

Based on Stambaugh's comments, Brady immediately confronted Rollins about "'not communicating with her[,]'" id. at p. 34, line 9, and told Rollins that Stambaugh had "'said that [he had been] . . . rude to her and acted irresponsibly when she refused to do to dinner with [him] . . . .'" Id. lines 1-2. Brady told Rollins that he and Stambaugh "'need[ed] to work that out[,]'" id. lines 9-10, because "'[t]here's no way [he was] . . . going to be able to train a person without communicating.'" Id. at p. 35, lines 8-9.
.

[19]Stambaugh filed her Charge of Discrimination with the Equal Employment Opportunity Commission on May 27, 2015.  See Doc. 1 at 6, ¶ 25.  She received her Notice of Right to Sue on September 30, 2016.  See id. ¶ 26.

has alleged that she has been the victim of "quid pro quo" sexual harassment,[20] a form of sex discrimination that "occurs when submission to sexual conduct is made a condition of concrete employment benefits."[21]   Hicks v. Gates Rubber Co., 883 F.2d 1406, 1413 (10th Cir. 1987).  "[T]he gravamen of a [Title VII] quid pro quo sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct."  Id. at 1414; e.g., Jones v. Needham, 856 F.3d 1284, 1292 (10th Cir. 2017).

In analyzing Stambaugh's claim, which is grounded solely on circumstantial evidence, the Court has applied the three-part framework developed by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which, together with subsequent decisions, "'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment

---

[20]Courts have recognized two types of sexual harassment claims:  quid pro quo sexual harassment and hostile work environment sexual harassment. E.g., Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987). But see Jones v. Needham, 856 F.3d 1284, 1291 (10th Cir. 2017)(Supreme Court has cautioned that the two forms of sexual harassment "are not wholly distinct claims;" rather, they "are shorthand descriptors to delineate different ways in which sexual harassment can occur"); Gregory v. Daly, 243 F.3d 687, 698 (2nd Cir. 2001)(no reason to create a separate doctrinal category for employers who make workplace success contingent on submission to supervisor's sexual demands; sexual quid pro quo is just another way in which an employer, in violation of Title VII, makes employee's sex relevant to employment decision).  As stated, Stambaugh has asserted that her claim is based on the first type and to that extent, the term "quid pro quo" is used, for purposes of the instant litigation, to mean, as Stambaugh has alleged, that Rollins' "harassment culminated in a tangible employment action." Pinkerton v. Colorado Department of Transportation, 563 F.3d 1052, 1059 n.4 (10th Cir. 2009).

[21]See 29 C.F.R. § 1604.11(a)(unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of individual's employment or (2) submission to or rejection of such conduct by individual is used as basis for employment decisions affecting that individual).

cases.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000)(quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993)).

Under the McDonnell Douglas burden-shifting approach, a complainant such as Stambaugh must first make a prima facie showing of quid pro quo sexual harassment,[22] e.g., Bird v. West Valley City, 832 F.3d 1188, 1200 (10th Cir. 2016), and while OWRB has argued that Stambaugh has not done so, the Court has assumed for purposes of the instant motion that Stambaugh could make the necessary showing and has instead focused on the second and third steps of the McDonnell Douglas framework.

In this connection, once a prima facie showing has been made (or, as in this case, assumed), the burden shifts to the employer, "'to articulate a legitimate, nondiscriminatory reason for the adverse [employment] action.'" Bird, 832 F.3d at 1200 (quoting EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007)). "This burden is one of production, not persuasion; it . . . 'involve[s] no credibility assessment.'" Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Center, 509 U.S. at 509).

The Court finds OWRB has met this burden by offering admissible evidence that Stambaugh "was terminated for the good of OWRB due to her chronic tardiness, concerns about inadequately performing her duties, insubordination to her supervisors, and behavioral issues[,]" Doc. 28 at 22, as reflected and summarized in Rollins' memorandum dated April 23, 2015. See Doc. 28-2.

Such is sufficient for a trier of fact to conclude, as OWRB has asserted, that it had "no alternative but to terminate . . . [Stambaugh's employment,]" Doc. 28 at 26, "[d]ue to

---

[22]Recognized as elements of a prima facie case of quid pro quo sexual harassment are (1) the plaintiff was subjected to unwelcome sexual harassment, (2) her reaction to that harassment affected a tangible employment benefit and (3) the harasser was her supervisor. See Hicks, 833 F.3d at 1414.

[her] . . . continuous performance issues[.]" Id. Accordingly, the presumption of quid pro quo sexual harassment created by Stambaugh's prima facie case "simply drops out of the picture[,]" St. Mary's Honor Center, 509 U.S. at 511 (citation omitted), and the burden shifts back to Stambaugh "to establish a genuine issue of material fact that . . . [OWRB's] reasons were pretextual." Bird, 832 F.3d at 1201.  Stambaugh bears the ultimate burden of persuasion of proving intentional discrimination in this case, and only if she "'presents evidence sufficient to create a genuine factual dispute regarding the veracity of [OWRB's] . . . nondiscriminatory reason[s], [may the Court] . . . presume the jury could infer that [OWRB] . . . acted for a discriminatory reason and . . . deny summary judgment.'" Jones v. Oklahoma City Public Schools, 617 F.3d 1273, 1280 (10th Cir. 2010)(quotation omitted).

"Evidence of pretext may . . . take a variety of . . . forms." Swackhammer v. Sprint/ United Management Co., 493 F.3d 1160, 1168 (10th Cir. 2007).  A plaintiff may show pretext by revealing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for th[ose] . . . reasons.'" Jones, 617 F.3d at 1280 (quotation omitted); e.g., Reeves, 530 U.S. at 147 (proof that defendant's explanation is unworthy of credence is one form of circumstantial evidence that is probative of intentional discrimination).

In support of her contention that OWRB's claimed reasons are pretextual, Stambaugh has offered the following:[23]

---

[23]Stambaugh has also argued that pretext may be shown by the fact that she "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1120 (10th Cir. 2007)(quotation omitted). "'Similarly situated employees are those who deal with the same supervisor and are

(1) OWRB's reason for firing her—to the extent that reason was her tardiness—is false;

(2) OWRB's "belated use[d,]" Doc. 34 at 30, of Rollins' memoranda dated November 3, 2014, and December 3, 2014, is a "post-hoc attempt to . . . enhance its reasons for [her] termination[,]" id. at 31; and

(3) OWRB "fail[ed] to follow its written [progressive disciplinary] policy for documenting and correcting [her] . . . alleged performance and behavior issues[.]" Id. at 32.

As stated, pretext may be shown "'with evidence that defendant's stated reason for the adverse employment action was false[.]'" Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004)(quotation omitted). If that evidence, however, is so incredible that it could not be accepted as true by a reasonable jury, such evidence cannot serve to create a "genuine" issue of fact.

As the United States Supreme Court has explained, "'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Stambaugh's statements that she was never tardy, that she did not know her

---

subject to the same standards governing performance evaluation and discipline.'" Id. (quotation omitted)(footnote deleted). In this connection, Stambaugh has argued that Theda Adkisson was supervised by Rollins and permitted to "come and go as she pleased." Deposition of Angela Taylor (March 28, 2018) at p. 40, line 7 9 (hereinafter "Taylor Deposition"). Based on the record, it appears that Stambaugh and Adkisson, even assuming she was supervised by Rollins, but see Rollins Affidavit at p. 1-2, ¶ 7, were not similarly situated: Stambaugh worked in the Floodplains Management Division and Adkisson, for whom no explanation has been given regarding her length of service, the circumstances of her employment or her entitlement to "flex time," see Brady Deposition at p. 39, lines 7-10, "ran the licensing side of the well driller program." Taylor Deposition at p. 40, line 8.

"start time" and that neither Rollins, nor Brady[24] ever counseled her about her tardiness (or any other matter[25]) are not supported by the record; thus, even viewing the evidence in Stambaugh's favor, the Court concludes that a jury could not find that OWRB's explanation of Stambaugh's termination based on tardiness is "unworthy of credence and hence infer that . . . [OWRB] did not act [in part] for th[at] nondiscriminatory reason[.]" Bennett v. Windstream Communications, Inc., 792 F.3d 1261, 1267 (10th Cir. 2015).

The Tenth Circuit has also recognized that a plaintiff may produce evidence of "'disturbing procedural irregularities[,]'" Jaramillo v. Colorado Judicial Department, 427 F.3d 1303, 1308 (10th Cir. 2005)(quotations omitted), including deviations from normal company procedure during the disciplinary process. "Such irregularities can be sufficient to call into question the employer's honesty and good faith in making the termination decision and, consequently, establish pretext." Bird, 832 F.3d at 1203 (citation omitted).

Stambaugh has argued that pretext can be inferred in this case from OWRB's "failure to follow its written policy for documenting and correcting [her] . . . alleged performance and behavior issues[,]" Doc. 34 at 32, and to adhere to its progressive discipline procedures. Section 6 of the OWRB Handbook implements Rule 455:10-11-1, MSPA Rules, and outlines the progressive discipline policy for permanent and probationary employees. The Handbook expressly provides that the progressive

---

[24]See Brady Deposition at p. 40, line 25 (in a meeting attended by Brady, Stambaugh and Rollins, Stambaugh's "tardiness was brought up"). See also Deposition of Brian Jepsen (March 28, 2018) at p. 68, lines 6-9 ("Q. Well, you said that . . . Stambaugh had been counseled on a number of occasions; right? A. There had been conversations about issues.").

[25]See Stambaugh Deposition at p. 128, line 25 to p. 129, line 10 ("Q. [I]s it your testimony that . . . Rollins never told you he was upset with your job performance? A. Yes. Q. Obviously, he didn't use those words, but with respect to individual tasks or projects, you are unaware or cannot recall a single instance in which . . . Rollins told you he was upset or criticized your job performance; is that right? A. That's correct.").

discipline policy is "designed to ensure not only the consistency, impartiality and predictability of discipline, but also the flexibility to vary penalties, if justified, by aggravating or mitigating conditions." OWRB Handbook, Section 6.1.1. "Causes for adverse action include, but are not limited to:  misconduct; insubordination; inefficiency; . . . inability or unwillingness to perform the duties of the position in which employed; . . . or any other just cause." Id. Section 6.1.3.

The Handbook recognizes two phases of discipline:  informal and formal. E.g., id. Section 6.1.3.A.-B.   The former includes "verbal warning[s]; informal discussions[;] corrective interviews[s]; [and] oral reprimand[s.]" Id. Section 6.1.3.A. "Documentation of informal discipline may be noted and maintained by the supervisor and employee[,]" id.,[26] and the employee must "be told, at a minimum, (a) the nature of the problem . . . and steps which must be taken to resolve the problem, and (b) the consequences of repeated infractions or continuing deficient performance or behavior." Id.

Formal discipline includes discharge.   E.g., id. Section 6.1.3.B.   "Absent aggravating circumstances, formal discipline is normally administered after informal discipline has failed to produce acceptable results[,]" id., and "[f]ormal discipline documentation shall include a citation of any other informal or formal discipline which was used in the decision to administer formal discipline." Id.

---

[26]The OWRB Handbook requires that "[d]ocumentation of informal discipline will be noted and maintained by the supervisor in accordance with . . . Rule 445:10-11-10[, MSPA Rules,]" OWRB Handbook Section 6.1.4.A, but recognizes that "[t]hese records are generally not available to the employee unless formal disciplinary action is taken." Id. (emphasis added).

Although Stambaugh has described Rollins' memoranda[27] as "secret[ ]
document[s,]" Doc. 34 at 7, it appears that his actions in documenting issues with
Stambaugh's work ethic were in accord with the express provisions of the OWRB
Handbook. Moreover, even assuming Rollins did not comply with OWRB's recordkeeping
requirements[28] and/or OWRB did not apply progressive discipline in this case, "not every
failure to follow every directive in an employer's policy manual gives rise to an inference
of pretext for invidious discrimination[,]" Johnson v. Weld County, 594 F.3d 2010, 1213
(10th Cir. 2010)(citation omitted); "[e]mployers often fail to follow written policy manuals
for benign (sometimes even very sound) business reasons[.]" Id.; e.g., Hysten v.
Burlington Northern Santa Fe Railway Co., 415 Fed. Appx. 897, 909 (10th Cir. 2011)(mere
fact employer failed to follow its own internal procedures does not necessarily suggest
that substantive reasons given by employer for its employment decision were
pretextual)(cited pursuant to Tenth Cir. R. 32.1). "For an inference of pretext to arise on
the basis of a procedural irregularity, . . . there must be some evidence that the irregularity
'directly and uniquely disadvantaged [the aggrieved] . . . employee[,]'" Johnson, 594 F.3d

---

[27]Stambaugh has argued that a jury may draw an adverse inference from the fact that an
overwhelming majority of these documents were created after March 10, 2015, and from the fact
that Brady knew a month before she was terminated that Rollins intended to take such action.
See Brady Deposition at p. 51, lines 14-21 ("A. He informed me that, if she didn't change things,
that she would be terminated. Q. So he told you that he was planning on taking disciplinary action
against her? A. Towards the very end. Yes."); e.g., id. at p. 51, line 25 to p. 52, line 8.

[28]Stambaugh has complained in particular that Rollins failed to explain to her the
consequences of being tardy as required by Section 6.1.3.A of the OWRB Handbook. See
Stambaugh Deposition at p. 222, lines 4-17.

at 1213 (quotation omitted)(emphasis added); no such evidence has been presented in this case.[29]

Stambaugh has further argued that OWRB's "belated use[,]" Doc. 34 at 30, and reliance in the instant motion on earlier memoranda that Rollins had drafted to bolster its decision to terminate her employment gives rise to an inference of discriminatory treatment. In this connection, "[i]nconsistency evidence . . . has traditionally been associated with proving pretext." Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 1002 (10th Cir. 2001)(citation omitted); e.g., Jones, 617 F.3d at 1280 (plaintiff may show pretext by revealing inconsistencies, incoherencies or contradictions in employer's proffered legitimate reasons for its action).

In its Answers and Responses to Plaintiff's Discovery Requests, see Doc. 34-7, OWRB identified Rollins' memorandum dated April 23, 2015, as "the reason[ ] supporting [its] . . . decision to terminate . . . [Stambaugh's] employment." Id. at 7, Answer to Interrogatory No. 10. That document does not refer to the incidents that are the subject of the memoranda dated November 3, 2014, see Doc. 28-14, and December 3, 2014, see Doc. 28-12;[30] yet, OWRB included them in its Motion for Summary Judgment as examples

---

[29]See Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995)(mere fact that employer failed to follow its own internal procedures does not necessarily suggest that employer was motivated by illegal discriminatory intent or that substantive reasons given by employer for its employment decision were pretextual).

[30]The memorandum dated November 3, 2014, recounted a meeting with the Cherokee County Floodplain Board that Rollins, Brady and Stambaugh attended. As stated, Stambaugh advised board members "that a [f]lood study would be needed[,]" Doc. 28-14, and continued to insist on the necessity of the same, even after Rollins and Brady "both explained that the regulations do not require . . . [a] study." Id.
The December 3, 2014, memorandum contained information about a meeting on November 25, 2014, that Rollins, Stambaugh, FEMA employee Ramirez and Piedmont City Planner Harden attended. See Doc. 28-12. In that memorandum, Rollins described a disagreement about municipal boundaries between Stambaugh and Ramirez and Harden. See id.

of "other instances of her insubordination[,]" Doc. 28 at 19, and as evidence of Stambaugh's "refus[al] to acknowledge and correct her deficiencies." Id. at 20.

That OWRB did not identify in its discovery response these earlier memoranda or explain in a supplemental discovery response that it may also rely on information in Stambaugh's personnel file that was not reflected in Rollins' memoranda dated April 23, 2015, in making the decision to terminate Stambaugh's employment does not in this instance give rise to any suggestion of pretext. OWRB's explanation and reason for Stambaugh's discharge has remained consistent: performance issues, as manifested by tardiness and insubordination.

Finally, Stambaugh has argued that the timing of her termination—"within a month and a half of . . . rejecting Rollins' advances[,]" Doc. 34 at 34, "is almost enough—by itself—to show pretext." Id. As Stambaugh recognizes, temporal proximity alone cannot establish pretext. In this circuit, "close temporal proximity is a factor in showing pretext, yet is not alone sufficient to defeat summary judgment." Annett v. University of Kansas, 371 F.3d 1233, 1240 (10th Cir. 2004)(citation omitted). That is to say, "close temporal proximity can support a finding of pretext only in combination with other evidence of pretext." Lobato v. New Mexico Environment Department, 733 F.3d 1283, 1293 (10th Cir. 2013). Because the Court has found "no other indication of pretext, close temporal proximity . . . is [therefore] of no moment in this case." Id.

Stambaugh has characterized Rollins' behavior as "a long-term plan to sexually exploit [her] . . . ." Doc. 34 at 6. In her response, she has argued that it began in summer 2014[31] when he leaned across her desk "[o]ne time[,]" Stambaugh Deposition at p. 36,

---

[31]Compare Stambaugh Deposition at p. 91, lines 1-20 ("Q. You had a bad working relationship; right? . . . A. Now until he started doing those things to me. . . . Q. You are talking

23

line 37;[32] it continued when he was "overly attentive to her—as if they were on a date[,]"

Doc. 34 at 6, while they traveled,[33] and it culminated on March 9 and 10, 2015, during

what she has described as "the worst week ever,"[34] Stambaugh Deposition at p. 56, lines

22-23, when, as he was "driving on a county road, . . . [he] leaned over, and "placed his

finger on [her] . . . left leg and ran it up the map towards [her] . . . private parts, in that

---

about when he invited you out to dinner and you wouldn't go?  A. And leaning over me on the computer [in Summer 2014]."), with Doc. 28-3 at 2, ¶ 2 ("negative treatment . . . began when she . . . decline[d] his requests to go to dinner").

[32]As Stambaugh described the incident:

> One time he leaned over me and he put his right arm around by right arm and grabbed my mouse, and I was going to try and maneuver out the left, and he quickly pushed his left arm on the other side of the desk, and I could not get up.  I could feel his breathing on my head.  I had to wriggle out from underneath his left arm, and then he told me, "Well, you didn't have to get up."

Stambaugh Deposition at p. 36, line 22 to p. 37, line 5.

[33]Stambaugh testified during her deposition that Rollins "would treat [her] . . .as if [they] were on a date." Id. at p. 45, lines 17-18.  As she explained,

> [h]e would kind of laugh and just always try and buy my dinner . . . I felt he was wanting it to appear to the other people around us that we were on a date, and he would treat me different during those times than he would throughout the entire day.

Id. lines 20-25.

> He would always open the door for me, let me order first, and it's just a type of behavior that he wouldn't treat me on other occasions whenever he wasn't doing that.

Id. at p. 47, lines 4-7; e.g., id. at p. 204, lines 2-5 ("The tone, the way he would look at me.  He would treat me different, and then once the dinner came along, he would just completely change his whole demeanor.").  She denied that he ever said anything inappropriate, see id. at p. 46, lines 1-4, but stated that "after January, February-ish[,]" id. at p. 47, line 25 to p. 48, line 1, "he would, a lot of time, get mad when [she] . . . would refuse for him to buy . . . [her] dinner." Id. at p. 46, lines 4-6.

[34]Stambaugh testified that while they were traveling that same week, Rollins "would not talk to [her] . . . [,]" id. at p. 105, line 22, and "was very rude[.]" Id. line 23.

direction." Id. at p. 68, lines 13-16.  Rollins "did [that] . . . three times on[,]" id. lines 16-17, on March 9, 2015, and three times on March 10, 2015.  Stambaugh had "to lift the map up so it wouldn't be touching . . . [her] leg and his finger would not be on . . . [her] leg[.]" Id. lines 17-19. Stambaugh testified that the first day, she did not tell him to stop; rather, she gave "him a horrible look." Id. lines 20-21.  The second day, she "believe[d] . . . she told him not to touch [her] . . . map." Id. at p. 69, lines 1-2.

Stambaugh never spoke to anyone at OWRB about these events until she was terminated on April 24, 2015, because, as she testified at her deposition, she "was out of the office a lot and very busy[,]" id. at p. 105, lines 11-12, and "was trying to finish getting all of [her] . . . presentations together and to complete the 202 course." Id. lines 2-4.

Stambaugh has admitted that Rollins never tried to seduce her, see id. at p. 46, lines 12-14, never made any inappropriate comments, see id. lines 1-4 and never invited her to, or attempted to get her into, his hotel room when they traveled.  See id. at p. 110, lines 9-14; e.g., id. at p. 111, lines 1-7.  She told Kirtley that "Rollins never . . . propositioned her[,]" Doc. 28-3 at 2, ¶ 2, and she has conceded that she and Rollins had a "difficult[,]" Stambaugh Deposition at p. 91, line 20, working relationship within two months of her start date.

The Court is mindful that sexual misconduct need not be explicit; Stambaugh is not required to show that Rollins demanded that she accede to unwelcome, offensive conduct.  There must, however, be some showing that the challenged conduct, when viewed in the light most favorable to Stambaugh, was sufficiently specific that there is a genuine issue of material fact about whether Stambaugh reasonably believed that submission to Rollins' unwelcome physical or verbal conduct or attentiveness was a term

or condition of her continued employment, that her rejection of that conduct or behavior was the basis for Rollins' memoranda or that a "tangible employment action . . . result[ed] from . . . [her] refusal to submit to [her] . . . supervisor's demands[.]" Needham, 856 F.2d at 1291.

The Court must consider the circumstances as a whole and assess the relationship between the unwelcome conduct—based on Stambaugh's sex and about which she has complained—Rollins' leaning over her computer in Summer 2014, his attentiveness and attempts to socialize while traveling together and particularly, his finger on the map on her lap on March 9 and 10, 2015—and her termination from employment.

It is not enough at this stage, in the Court's opinion, that Rollins may have engaged in offensive conduct, that he is Stambaugh's supervisor and therefore had the authority to materially affect the terms and conditions of her employment or that his memorandum prompted her discharge. Stambaugh must show, but has not, that a reasonable juror could find that her reaction to or rejection of that conduct culminated in her termination.

As the Tenth Circuit has explained for purposes of establishing causation, "a plaintiff cannot show that a supervisor's harassment 'culminated' in a tangible employment action merely by demonstrating that th[at] . . . action followed the harassment." Helm v. Kansas, 656 F.3d 1277, 1287 (10th Cir. 2011)(citation omitted). Rather, "the plaintiff must establish a strong causal nexus between the supervisor's harassment and the tangible employment action." Id. (citation omitted). And while close temporal proximity between a plaintiff's reaction to harassment and the employment action may in certain circumstances establish causation, in this case, even if Rollins displayed unwelcome behavior to which Stambaugh reacted negatively, it is mere

conjecture that Rollins thereafter not only complained about Stambaugh to Brady, but also peppered Stambaugh's personnel file with memoranda regarding her tardiness and insubordination and then drafted one last memorandum all with the intent that his supervisors would terminate Stambaugh's employment.

Stambaugh was required to do more than provide conclusory assertions or her subjective interpretation of the evidence, and the Court finds, based upon the foregoing, that Stambaugh has failed to set forth specific evidence from which a reasonable juror could conclude that there is a causal connection between Rollins' conduct and the termination of her employment. E.g., Tran v. Sonic Industries Services, Inc., 490 Fed. Appx. 115, 118 (10th Cir. 2012)(to oppose summary judgment, plaintiff must do more than provide subjective interpretation of evidence)(cited pursuant to Tenth Cir. R. 32.1).  The adverse employment decision Stambaugh "suffered did not arise from her refusal to acquiesce in her supervisor['s] sexual conduct [or from her reaction to, or rejection of, that conduct], but rather, . . . [was] due solely to her inadequate job performance." Hicks, 833 F.2d at 1414.

Because summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which th[at] party will bear the burden of proof at trial[,]" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), the Court finds that OWRB is entitled to judgment as a matter of law on Stambaugh's Title VII quid pro quo sexual harassment claim.

The Court therefore

(1) GRANTS OWRB's Motion for Summary Judgment [Doc. 28] filed on April 4, 2018; and

(2) ORDERS that judgment in favor of OWRB issue forthwith.

ENTERED this _25th_ day of May, 2018.

LEE R. WEST
UNITED STATES DISTRICT JUDGE